IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

EZEKIEL GAMBLE, JR.,    :
            :
    Plaintiff,    :
  VS.         :
            :  NO. 5:15-CV-113-MTT-MSH
WARDEN BRUCE CHATMAN *et al.*, :
            :
    Defendants.   :
_____ :

## ORDER & RECOMMENDATION

Presently pending before the Court is Defendants' motion for summary judgment (ECF No. 47) and Plaintiff's motions for "Court to Enquire of Defendants' Documentation" (ECF No. 49), to "Deny or at Least Stay Defendants' Reply Brief" (ECF No. 52), "Suppl[emental] Motion to Refute Defendants' Bruce Chatman and Stanley Williams' Reply Brief" (ECF No. 54), to Supplement his Complaint (ECF No. 56), and to appoint counsel (ECF No. 61). For the reasons explained below, it is recommended that Defendants' motion for summary judgment be granted and that Plaintiff's motion to supplement be denied. Additionally, Plaintiff's motion for "Court to Enquire of Defendants' Documentation" (ECF No. 49) is terminated, Plaintiff's motion to "Deny or at Least Stay Defendants' Reply Brief" (ECF No. 52) is granted, the "Suppl[emental] Motion to Refute Defendants' Bruce Chatman and Stanley Williams' Reply Brief" (ECF No. 54) is terminated, and the motion to appoint counsel is denied (ECF No. 61).

# BACKGROUND

Plaintiff alleges that Defendants Bruce Chatman—Warden of Georgia Diagnostic and Classification Prison's ("GDCP")—and Stanley Williams—Warden of Georgia State Prison ("GSP")—violated his due process rights by forcibly medicating him over a period of several years without providing an adequate appeal process. Compl. 7, ECF No. 1; *see also* Second Am. Compl. 4, 6, ECF No. 22.   Plaintiff is currently serving two life sentences for armed robbery, aggravated assault, and a number of other charges.   Gamble Dep. 12, ECF No. 47-8.[1]   Plaintiff is seriously mentally ill and has been diagnosed with Schizoaffective Disorder, Bipolar Type and Antisocial Personality Disorder.   Dobson Aff. ¶ 6, ECF No. 47-4;[2] Gamble Dep. 19.   These disorders are chronic.   Dobson Aff. ¶ 6. Plaintiff consistently displays a lack of insight into his mental conditions and has a history of non-compliance with his prescribed treatment.   Moyenda Aff. ¶ 8, 12, ECF No. 47-5.[3]

From 1994—when Plaintiff began his incarceration—until 2010, Plaintiff was confined at GSP.   Gamble Dep. 12.   Plaintiff received eighteen (18) disciplinary reports ("DRs") between 2009 and 2012.   Gamble Dep. 20; James Aff., Attach. 2, ECF No. 47-3.[4]   Plaintiff received these DRs for failure to follow instructions, starting fires, insubordination, and for threats or acts of violence—including an incident in 2010 when

---

[1] Plaintiff's deposition, taken on November 24, 2015, is labeled as Exhibit F of Defendants' Motion for Summary Judgment.  (ECF No. 47-8.)

[2] Dr. David Dobson's Affidavit is labeled as Exhibit B of Defendants' Motion for Summary Judgment.  (ECF No. 47-4.)

[3] Dr. Kamau Moyenda's Affidavit is labeled as Exhibit C of Defendants' Motion for Summary Judgment.  (ECF No. 47-5.)

[4] Carrie James' Affidavit is labeled as Exhibit A of Defendants' Motion for Summary Judgment. (ECF No. 47-3.)

Plaintiff attacked and injured a GDC nurse with a knife.  James Aff. ¶ 5 & Attach. 2, ECF No. 47-3; Dobson Aff., Attach. 6 at 5, ECF No. 47-4.  As a result of this incident, Plaintiff was transferred to the GDCP's Special Management Unit ("SMU"), where he was housed until June 2014.  Gamble Dep. 12-13, 20; Moyenda Aff. ¶ 7.  Due to the risks posed by Plaintiff's behavior to himself and to others and due to his history of refusing medication, Plaintiff's physicians initiated the prison's involuntary medication procedures.  Moyenda Aff. ¶¶ 8, 9; Dobson Aff. ¶¶ 9-12.

Defendants assert that the GDC utilizes the Standard Operating Procedure ("SOP") VG66-0001, "Involuntary Medication Administration," when administering psychotropic drugs involuntarily to inmates in the GDC system.  Dobson Aff. ¶ 4.  The SOP cites as guiding authorities O.C.G.A. § 37-3-163[5] and the Supreme Court's decision in *Washington v. Harper*, 494 U.S. 210 (1990).  Pl.'s Resp. in Opp'n to MSJ Ex. 1 at 1-2, ECF No. 50-3; Dobson Aff., Attach. 1 at 2.  Although the SOP states that physicians prescribing psychotropic medication are required to seek voluntary participation from inmates and that inmates have the right to refuse medication, the SOP also provides for

---

[5] O.C.G.A. § 37-3-163 states in relevant part:

> It shall be the policy of this state to protect, within reason, the right of every individual to refuse medication except in cases where a physician determines that refusal would be unsafe to the patient or others. If the patient continues to refuse medication after such initial emergency treatment, a concurring opinion from a second physician must be obtained before medication can be continued without the patient's consent. Further, in connection with any hearing under this chapter, the patient has the right to appear and testify as free from any side effects or adverse effects of the medication as is reasonably possible.

O.C.G.A. § 37-3-163(b).  The statute also provides that "[a]ny patient objecting to the treatment being administered to him shall have a right to request a protective order pursuant to Code Section 37-3-148."  O.C.G.A. § 37-3-163(c).

two exceptions that allow for the involuntary administration of medication: (1) during a "Psychiatric Emergency" and (2) when the inmate suffers from a "Chronic Condition." SOP §§ VI(B)(1)(a), VI(B)(1)(b).  In the first circumstance, a physician may administer a single dose of medication—unless a due process hearing is set for further dosage—when the inmate:

> (a) Presents a substantial risk of imminent harm to him/her self or others as manifested by recent overt acts or recent expressed threats of violence which present a high probability of physical injury to him/her self or to other persons[,] or
> (b) Who is so unable to care for his/her own personal health or safely [sic] as to create an imminently life-endangering crisis.

SOP §§ VI(B)(1)(a)(1)(a-b). Involuntary medication may be administered due to a "Chronic Condition" when:

> [T]he inmate/probationer refused to accept medication, in the treatment of a chronic psychiatric condition, when the inmate/probationer is currently dangerous to self or others and there is no expectation of improvement or when there exists a probability of a deterioration of the inmate's/probationer's mental condition as supported by the inmate's/probationer's medical history and it is determined:
>
> (a) That such a deterioration would result in behavior which would be life endangering to the inmate/probationer or others[,] or
>
> (b) That without medication the inmate/probationer would be incapable of participating in any treatment plan which would give him/her a realistic opportunity to improve his/her condition.

SOP §§ VI(B)(1)(b)(1)(a-b).  Pursuant to the SOP, if an inmate meets either of these requirements but "refuse[s] medication by verbal statement, written statement, gesture, or silence," the treating physician must then explain to the inmate their medical assessment, the reasons for prescribing the medication, the risks and benefits of taking the

medication, and the advantages and disadvantages of opting for either voluntary or involuntary administration of the medications.  SOP §§ VI(C)(1)(a-d).  If the inmate still refuses to voluntarily take the prescribed medication, the treating physician shall then: (1) inform the inmate that the medication may be administered involuntarily and that such a course of action will be discussed by the Mental Health Due Process Committee during a Due Process Hearing; (2) "[w]ithin 14 working days of the inmate/probationer being informed that medication may be given involuntarily, the physician will request a second opinion on the need of involuntary medication administration"; and (3) will initiate an involuntary medication due process hearing, should the first two steps be met.  SOP §§ VI(C)(2)(a-e), VI(D).

Due Process Hearings are heard by a committee comprised of three members who are appointed by the Mental Health Unit Manager at each institution: the Deputy Warden of Care & Treatment or a designee; a professional member of the mental health staff; and a member of the medical staff.  *Id.* §§ VI(D)(2)(a-c).  These committee members are not permitted to be directly involved with the inmate's treatment.  *Id.* §§ VI(D)(2)(b-c).  The Due Process Hearing Committee is tasked with determining "whether the inmate/probationer is mentally ill and has a condition that meets the criteria" for involuntary medication.  *Id.* § VI(E)(6).  During the hearing, either the Mental Health Unit Manager or another staff member will advocate on behalf of the state.  *Id.* § VI(E)(1).  The inmate may either retain legal counsel or be assigned a staff advocate to assist him in presenting evidence and arguing his position.  *Id.*  The inmate will receive 24 hour written notice prior to the hearing and will meet with his assigned advocate to

prepare for the hearing. *Id.* §§ VI(E)(3), VI(E)(5). The inmate is permitted to present evidence, question witnesses, and advocate for his position during the hearing. *Id.* §§ VI(E)(10-11). Following the hearing, the committee will retire to deliberate in private and will thereafter issue its finding in writing and a copy of which will be provided to the inmate. *Id.* §§ VI(E)(13-15), VI(F). "Decisions to continue involuntary medication status require a rehearing process every six (6) months." *Id.* § VI(E)(16).

Plaintiff has been on involuntary medication status since at least 2012—with a brief period off medication from October 2013 through August 2014—and received due process hearings every six months.[6] In each instance, Plaintiff's treating physician would first speak with him—or attempt to do so—in order to discuss the need for psychotropic medication and Plaintiff would refuse to voluntarily take the medication. Gamble Dep. 23-24, 34, 43, 45-47, 49-52; Dobson Aff. ¶¶ 9, 10, 11; Moyenda Aff. ¶ 9. Thereafter, Plaintiff's treating physician would request and receive a second written opinion agreeing with the need to involuntarily medicate Plaintiff. Dobson Aff. ¶¶ 9, 10, 11 & Attach. 7, 8, 9; Moyenda Aff. ¶ 9 & Attach. 3. Due Process Hearings were scheduled and Plaintiff received written notifications informing him of the hearings in advance. Gamble Dep. 22; Spikes Aff. ¶ 6 & Attach. 2; Todd Aff. ¶ 7 & Attach. 2, 3, 4. Plaintiff was assigned a staff advocate, who explained Plaintiff's rights and assisted him in preparing for the hearing in advance. Spikes Aff. ¶ 7 & Attach. 2; Todd Aff. ¶ 7 & Attach. 2, 3, 4; Gamble Dep. 35, 53-54. Plaintiff personally attended each hearing and was given the opportunity

---

[6] These hearings took place on November 6, 2012; May 1, 2013; August 28, 2014; February 24, 2015; and August 20, 2015. Dobson Aff., Attach. 2, 3, 7, 8, 9, ECF No. 47-4; Gamble Dep. 32-33; Spikes Aff. ¶ 5, ECF No. 47-6; Todd Aff. ¶¶ 5-6, ECF No. 47-7.

to present evidence and question witnesses.   Spikes Aff. ¶¶ 6-7; Todd Aff. ¶¶ 6, 7; Gamble Dep. 48, 52, 53.   The hearings were conducted by impartial committee members who were not otherwise involved in Plaintiff's treatment.   Spikes Aff. ¶ 5; Todd Aff. ¶ 5. After deliberating, the committee members determined that Plaintiff met the criteria for involuntary medication and provided Plaintiff with a copy of their written decision. Spike Aff. ¶ 8; Todd Aff. ¶ 8; Gamble Dep. 32, 36, 48, 53, 54.

Plaintiff has filed a number of grievances relating to his involuntary medication status, including grievances complaining about the side effects of his medication[7]; grievances requesting a determination of whether the SOP was being complied with during his involuntary medication proceedings[8]; and grievances complaining that the involuntary medication proceedings did not comport with due process.[9]   Although one

---

[7]   Gamble Dep. 61 & Ex. 6, ECF No. 47-8 (Grievance No. 144341 submitted on February 26, 2013, wherein Plaintiff complained that "Dr. Moyenda denied [that Plaintiff] ha[d] any extrapyramidal side effects."); Gamble Dep. 71-72 & Ex. 10, ECF No. 47-8 (Grievance No. 165694 submitted on January 9, 2015 wherein Plaintiff alleges he experiences the side effects of "eating feces; drinking urine; spreading feces over upper body when involuntarily medicated . . . dyskinesia, akathisia, akinesia, dystonia, breast enlargement/milk; Gender [identity] crisis; drooling, trouble swallowing, physical weakness, fatigue, memory loss, eyes rolling up in head, auditory/hallucinations, [and] paranoia.").

[8]   Gamble Dep. 66 & Ex. 8, ECF No. 47-8 (Plaintiff submitted Grievance No. 180821 on September 4, 2014 and requested a determination of whether the involuntary medication proceedings on August 27, 2014 were properly conducted).

[9]   Gamble Dep. 64-65 & Ex. 7, ECF No. 47-8 (Grievance No. 147781 was submitted by Plaintiff on June 19, 2013, alleging that Plaintiff's doctors and the Due Process Committee members failed to "establish[ ] [Plaintiff's] incompetency by due process in a court of law[,] thus they are depriving me of my right to refuse long-term involuntary psychiatric treatment."); Gamble Dep. 68 & Ex. 9, ECF No. 47-8 (Plaintiff submitted Grievance No. 188141 on January 7, 2015, complaining that he was denied his right to appeal the decision to be involuntarily medicated); Compl. Ex. A, ECF No. 1-1 (Warden Chatman's response to Grievance No. 153735, wherein Plaintiff complained that he was denied the right to appeal his involuntary medication status, and the warden "partially granted" the grievance "pending the inmate's appeal of his involuntary medication status" and noting that there "does not appear to be any thing [sic] in SOP showing the process for the inmate to appeal.").

grievance was denied as untimely (Grievance No. 180821), the remaining grievances were investigated by the warden.  Gamble Dep. Exs. 6, 7, 8, 9, 10; Compl. Ex. A.  After Grievance Nos. 144341, 147781, & 165694 were denied by the warden, Plaintiff administratively appealed these decisions and the claims were investigated again by GDC Central Office clinical staff.  Gamble Dep. Exs. 6, 7, 10.  Grievance No. 153735 was partially granted by Defendant Chatman on August 28, 2013 pending an appeal of the decision to place Plaintiff on involuntary medication status.  Compl. Ex. A.

At some point in October 2013, Plaintiff requested to be taken off involuntary medication status and he was permitted to transition to voluntary oral medication on a trial basis.  Moyenda Aff. ¶ 10 & Attach. 4; Gamble Dep. 37.  Plaintiff alleges that the agreement to permit him to try voluntary oral medication came about because of Grievance No. 153735.  Gamble Dep. 37-39.  In April 2014, Plaintiff transitioned off his medication entirely against the advice of Dr. Kamau Moyenda, his treating physician at the time.   Moyenda Aff. ¶ 11; Gamble Dep. 36, 39.  After Plaintiff was transferred to GSP in June 2014, he began to rapidly decompensate.  Dobson Aff. ¶ 8 & Attach. 6; Moyenda Aff. ¶ 11.  Defendants assert that in August 2014, Plaintiff was observed naked, standing in the toilet in his cell, having smeared his body and the cell walls with feces.  Dobson Aff. ¶ 8 & Attach. 6.  Plaintiff, however, contends that he never smeared feces on himself, but rather had only "cleaned out [his] toilet and took all the water out of it, . . . and put one foot in the toilet . . . and one foot out of the toilet and started play acting[.]"  Gamble Dep. 40-41.  Because of this strange behavior, Plaintiff was admitted to the Crisis Stabilization Unit ("CSU") at GSP and examined by Dr. David Dobson.  Dobson

Aff. ¶ 8 & Attach. 6 at 7 ("Dr. Dobson interviewed [Plaintiff] then made [the] decision" to admit Plaintiff to the CSU and stabilize Plaintiff with medication); Gamble Dep. 40. Upon examining Plaintiff, Dr. Dobson observed that Plaintiff was "exhibiting bizarre behavior, appeared to be hallucinating, spoke incoherently, had disorganized thoughts, and lacked balance when he stood."  Dobson Aff. ¶ 8 & Attach. 6.  Based on these observations, Dr. Dobson determined that Plaintiff's condition presented a psychiatric emergency due to Plaintiff's mental illness, the fact that his behavior "presented a substantial risk of imminent harm to either himself or others," and because Plaintiff's behavior indicated that he was "unable to care for his own personal health as to create an imminently life-endangering crisis."  Dobson Aff. ¶ 8 & Attach. 6.  Thereafter, Plaintiff was again placed on involuntary medication status, where he has remained since, because his treating physicians and the Due Process Committee members determined that Plaintiff's condition is chronic and that Plaintiff would present a substantial risk of harm to himself or others if he were not on medication.  Dobson Aff. ¶¶ 10, 11, 12; Moyenda Aff. ¶¶ 8, 9, 12.

Plaintiff is currently prescribed Haldol, Depakote, and Benadryl.  Gamble Dep. 9. Although Plaintiff contends that he had "even more assaults on involuntary med[ication] status than off," Plaintiff has not had a single DR since 2012.  Gamble Dep. 21; James Aff. ¶ 4.  Plaintiff's treating physicians state that Plaintiff's behavior has markedly improved since being placed on involuntary medication status.  Dobson Aff. ¶ 12; Moyenda Aff. ¶ 12.  Plaintiff's doctors are monitoring him closely for known minor and major side effects (which include restlessness and involuntary movement) and believe

that the risks of medication are far outweighed by the impact the medication has on Plaintiff's symptoms, given that Plaintiff has not exhibited any serious negative side effects.  Dobson Aff. ¶ 13; Moyenda Aff. ¶ 13.

On March 25, 2015, Plaintiff filed the instant action.  (ECF No. 1 at 8.)  Therein, Plaintiff states that on August 28, 2013, Defendant Chatman denied him the ability to appeal a decision to forcibly administer antipsychotic drugs and Benadryl.  On February 16, 2015, Defendant Williams likewise denied Plaintiff the ability to appeal the decision to involuntary administer a different antipsychotic medication, Benadryl, and Depakote. Plaintiff alleges that he suffers various side effects from these drugs, including "eating feces, drinking urine, chemical imbalance of the brain, jerking hands, arms, feet, head, pacing to and fro, marching in place, drooling, faint up standing."  Compl. 7; *see also* Pl.'s Resp. in Opp'n to MSJ 8, ECF No. 50-1.

After a preliminary review, service was ordered on Defendants.  Order 6-7, June 29, 2015, ECF No. 9.  Defendants filed their Answer on September 1, 2015.  (ECF No. 15.)  Plaintiff filed his Second Amended Complaint on September 16, 2015.[10]  (ECF No. 22.)  The Second Amended Complaint sought to amend the complaint to include: (1) a new range of dates during which Plaintiff claims he was involuntarily medicated;[11] (2) a

---

[10] On September 7, 2015, Plaintiff filed an Amended Complaint, clarifying that he is suing Defendants in their individual and official capacities and requesting that the Court enter a declaratory judgment "stating plaintiff has a right to appeal the Involuntary Medication decisions."  Am. Compl. 1, ECF No. 19.  On September 14, 2015, Plaintiff filed a Notice of Withdrawal stating that he was withdrawing several filings, including the Amended Complaint, and indicating that he would submit a more complete amended complaint at a future date. Notice of Withdrawal 1, ECF No. 21.
[11] The Second Amended Complaint alleges that while incarcerated at GDCP, Plaintiff was involuntarily medicated from July 12, 2012 through October 17, 2013.  Second Am. Compl. 4.

request for declaratory relief; and (3) a statement indicating that Plaintiff has been experiencing side effects from the medication since August 4, 2014.   Second Am. Compl. 4, 6.  On October 12, 2015, Plaintiff filed a "Motion to Terminate Involuntary Medication" (ECF No. 26), which the Court construed as a motion for a preliminary injunction.  On December 4, 2015, the undersigned filed a Report and Recommendation granting Plaintiff leave to amend and recommending that Plaintiff's motion for a preliminary injunction be denied.  O. & R. 4-6, Dec. 4, 2015, ECF No. 32.  The Court subsequently adopted the Recommendation and denied Plaintiff's motion for a preliminary injunction.  Order 1, 3, April 4, 2016, ECF No. 53.

On January 28, 2016, Defendants filed a motion for summary judgment (ECF No. 47) and Plaintiff thereafter filed a response in opposition (ECF No. 50).  Plaintiff also filed several other motions, including: motion for the "Court to Enquire of Defendants' Documentation" (ECF No. 49), motion to "Deny or at Least Stay Defendants' Reply Brief" (ECF No. 52), "Suppl[emental] Motion to Refute Defendants' Bruce Chatman and Stanley Williams' Reply Brief" (ECF No. 54), a motion to for leave to file a Supplemental Complaint (ECF No. 56), and a motion to appoint counsel (ECF No.61).  These motions are now ripe for review.

## DISCUSSION

## I.   Defendant's Motion for Summary Judgment

### A.   Standard of Review

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

B.     Due Process Claims

The Fourteenth Amendment's Due Process Clause provides for substantive and procedural due process protections.  *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994) (en banc).  The former "protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'"  *McKinney*, 20 F.3d at 1556 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).  Procedural due process requires the government to follow "appropriate procedures when its agents decide to 'deprive any person of life, liberty, or property.'"  *Daniels v. Williams*, 474 U.S. 327, 331 (1986).  Defendants contend that the uncontested facts show that neither Plaintiff's substantive due process rights nor his procedural due process rights were violated and they are entitled to judgment as a matter of law.  Br. in Supp. of MSJ 11-17, ECF No. 47-1.

1.     *Substantive Due Process Claims*

As previously stated, substantive due process protects those fundamental rights that are "implicit in the concept of ordered liberty."  *Palko*, 302 U.S. at 325.  The Supreme Court in *Washington v. Harper* determined that there is a "significant liberty

interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."  494 U.S. 210, 221-22 (1990).  However, "even when the constitutional right claimed to have been infringed is fundamental[,]" "the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.'"  *Id.* at 223 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  After applying the relevant *Turner* factors, the Supreme Court ultimately concluded that "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."  *Id.* at 227.

Defendants argue that the uncontroverted evidence clearly establishes that Plaintiff is seriously mentally ill.  Dobson Aff. ¶¶ 6, 16; Gamble Dep. 19.  Record evidence also reveals that Plaintiff's treating physicians believe that in light of Plaintiff's medical history, past history of violent behaviors, and Plaintiff's rapid deterioration in August 2014 when he was off medication, Plaintiff "poses a substantial risk of harm to himself or others."  Dobson Aff. ¶ 12; *see also* Moyenda Aff. ¶ 12.  Furthermore, Plaintiff's physicians believe that the medication is responsible for Plaintiff's improvement in both his mental health and his behavioral responses.  Dobson Aff. ¶ 12.  Additionally, Plaintiff's treating physicians are closely monitoring Plaintiff for signs of any minor or major side effects from the medication and have not observed any side effects that would cause them to consider taking Plaintiff off the medication.  Dobson Aff. ¶ 13; Moyenda

Aff. ¶ 13.  Finally, Dr. Dobson opined that the side effects of eating feces, disorganized thoughts, paranoia, and chemical imbalance of the brain that Plaintiff claims to suffer from are not side effects from the medication, but rather are symptoms of his mental illness.  Dobson Aff. ¶ 13.

Although Plaintiff alleges that the medications do not provide any benefit (Gamble Dep. 26), "interfere with [his] access to [his] God" (Gamble Dep. 59-60), and cause side effects including "eating feces, paranoia, disorganized thoughts, or chemical imbalance of the brain," (Second Am. Compl. 4, 6), Plaintiff does not present any medical evidence in support of such contentions.  His personal belief, unsupported by expert medical testimony or evidence, that the medications are causing certain undesirable side effects is insufficient to establish a "genuine dispute of material fact."

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is *competent to testify on the matters stated*."  Fed. R. Civ. P. 56(c)(4) (emphasis added).  The issue of whether Plaintiff's medications improve his mental condition or cause certain side effects "presents a technical and scientific issue that requires the specialized knowledge of an expert medical witness."  *Wingster v. Head*, 318 F. App'x 809, 815-16 (11th Cir. 2009).  Plaintiff is not competent to testify as to whether "eating feces" and paranoia are side effects of his medication or rather symptoms of Plaintiff's mental illness.  Additionally, Plaintiff fails to produce any medical expert testimony, medical treatises, or medical research that tends to refute Dr. Dobson's contention that Plaintiff's mental illness, and not the psychotropic medication, causes

Plaintiff to eat feces.  Moreover, by both Plaintiff's own account and the affidavits put in evidence by Defendants, Plaintiff has not had a DR since 2012—about the time when he was first placed on involuntary medication status—indicating that the medication is in Plaintiff's (and the prison staff's) best interest.

The undisputed evidence establishes that the medication is effective, presents little risk of harm to Plaintiff, and is necessary because Plaintiff is a "danger[ ] to himself or others and the treatment is in the inmate's medical interest."  The risks of harm to Plaintiff are substantially outweighed by the benefit the medication provides to Plaintiff and those who interact with Plaintiff on a daily basis, and therefore no substantive due process violation occurred.  It is recommended that Defendants' motion for summary judgment be granted with regard to Plaintiff's substantive due process claims.

## 2.    *Procedural Due Process Claims*

"In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*"  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original).  In other words, governmental bodies are required to provide "appropriate procedures" to safeguard against *mistaken or unjustified* deprivations of life, liberty, or property.    *See, e.g., Parratt v. Taylor*, 451 U.S. 527, 537 (1981), *overruled on other grounds by Daniels*, 474 U.S. at 330-334 (emphasis added); *see also Carey v. Piphus*, 435 U.S. 247, 259 (1978).  "The fundamental requirement of due process is the opportunity to be heard and it is an opportunity which must be granted at a meaningful

15

time and in a meaningful manner." *Parratt*, 451 U.S. at 540 (internal quotation marks and citations omitted).

Because there is "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause[,]" the next step is determining "what procedural protections are necessary to ensure that the decision to medicate an inmate against his will is neither arbitrary nor erroneous[.]" *Washington v. Harper*, 494 U.S. 210, 221-22, 228 (1990). When making this determination, a court must consider three factors: "the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements." *Id.* at 229 (quoting *Hewitt v. Helms*, 459 U.S. 460, 473 (1983)) (internal quotation marks omitted). In order to determine whether a procedural due process violation has occurred, "it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." *Zinermon*, 494 U.S. at 126.

Defendants contend that the SOP procedures are in all relevant aspects identical to the procedures the Supreme Court found to be constitutional in *Washington v. Harper*, 494 U.S. 210 (1990) ("*Harper*"). Br. in Supp. of MSJ 13-14. Specifically, the SOP, like the Washington state procedures, requires first a medical determination by the inmate's treating physician that the inmate has a mental illness, that the inmate is likely to harm himself or others without being medicated, and the inmate is refusing such medication; that medical opinion is then reviewed by a second doctor; a hearing is initiated wherein

the inmate is given 24 hours' notice, has the right to present evidence and question witnesses, and is represented wither by a lawyer or a staff advocate; the committee members are medical professionals who are not involved in the inmate's diagnosis or care; and a rehearing is provided every six months thereafter.  *Id.*

Plaintiff does not specifically controvert Defendants' assertions that these SOP procedures were followed prior to and during the administration of involuntary medication.[12]   However, Plaintiff does contend that these SOP procedures were insufficient and meaningfully dissimilar from those approved by the Supreme Court in two significant respects: (1) the SOP does not require a psychiatrist to serve on the Due

---

[12] In accordance with Federal Rule of Civil Procedure 56(e) and Local Rule 56, in response to Defendants' motion for summary judgment and Defendants' attached statement of material facts, Plaintiff submitted an enumerated response to each of Defendants' 55 "material facts."  (ECF No. 50-2.)  Therein, Plaintiff contends that 44 of the 55 statements are "irrelevant."  *Id.* ¶¶ 2, 4-6, 10-29, 31-39, 42-52.  Plaintiff's mere assertion that such facts are "irrelevant" fails to comply with Local Rule 56's requirement that material facts be "specifically controverted by specific citation to particular parts of materials in the record," and thus those 44 material facts are deemed admitted.  M.D. Ga. L.R. 56.  Included in the statements Plaintiff deemed "irrelevant" are the descriptions of the SOP procedures and their applicability to Plaintiff's hearings.

However, Plaintiff does take issue with Defendants' statement he personally attended all hearings and had the opportunity to present evidence and examine witnesses.  Pl.'s Resp. to Defs.' SMF ¶¶ 8, 40.  Specifically, Plaintiff claims that during the August 28, 2014 hearing, his ability to present evidence was "compromised" because he was held in the CSU ("Crisis Stabilization Unit") without pencils, paper, legal materials, postage, grievance, and recreation "before, during, and after said hearing."  *Id.*  Plaintiff does not detail exactly how his ability to present evidence was compromised nor does he point to any piece of evidence that was not admitted at the hearing that may have otherwise impacted the outcome.  Therefore, because Plaintiff's vague and unsupported statement that his ability to present evidence was "compromised" does not create a genuine issue of material fact, the fact that Plaintiff attended all hearings and had the opportunity to present evidence and examine witnesses is deemed admitted.  As to the remaining ten statements of material fact that Plaintiff takes issue with, his contentions about the side effects of the medication (*id.* ¶¶ 53-55) were discussed and dismissed *supra* Section **I**.**B**.*1.* and his issues regarding the facial constitutionality of SOP's procedures will be discussed *infra* (*id.* ¶¶ 1a, 1b, 9, 30).

Process Committee, and (2) the SOP does not provide for the right to appeal the Due Process Committee's determination.[13]

a.    Right to a Reviewing Psychiatrist

Plaintiff first argues that the hearings failed to comport with the Due Process Clause because the SOP does not require that one member of the Due Process Committee be a psychiatrist—unlike the state prison requirements that were found to be constitutional in *Harper*.  However, Plaintiff misconstrues the Supreme Court's decision in *Harper*: "*Harper* did not hold that the standards of Washington state were the minimum federal due process requirements for involuntary medication.  Instead, the Supreme Court held that the Washington scheme did not violate federal constitutional requirements."  *Hightower by Dahler v. Olmstead*, 959 F. Supp. 1549, 1563 (N.D. Ga. Sept. 30, 1996).  While the Georgia SOP's requirements for the composition of the Due

---

[13] Plaintiff also appears to allege that Dr. Dobson's decision to involuntarily administer medication in response to the "Psychiatric Emergency" posed by Plaintiff's rapid decompensation in August 2014 did not comport with the SOP requirements or due process.  Pl.'s Resp. to Defs.' SMF ¶¶ 1a, 3, 30; *see also* Pl.'s Resp. in Opp'n to MSJ 3, 4.  Specifically, Plaintiff questions whether he was actually examined by Dr. Dobson or just a medical "provider" and thus whether the SOP was followed on this and other occasions.  Pl.'s Resp. to Defs.' SMF ¶¶ 1a, 3, 30.  These arguments are irrelevant as they do not present a genuine dispute over any material facts.  From the record before the Court, it is clear that Dr. Dobson did in fact examine Plaintiff following his placement in the CSU.  *See*, *e.g.*, Dobson Aff. ¶ 8 ("Based upon my examination, I determined that it was a psychiatric emergency because [Plaintiff] was mentally ill, presented a substantial risk of imminent harm to either himself or others, and seemed unable to care for his own personal health as to create an imminently life-endangering crisis[.]"); Dobson Aff., Attach. 6 at 7 ("Dr. Dobson interviewed [Plaintiff] then made [the] decision" to admit Plaintiff to the CSU and stabilize Plaintiff with medication).  Moreover, "[s]ection 1983 does not create a remedy for every wrong committed under the color of state law, but only for those that deprive a plaintiff of a federal right."  *Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002).  Therefore, the issue is not whether Defendants' actions were in accord with the SOP guidelines, but rather whether Defendants' actions were in accord with the requirements of due process.  The record establishes that Plaintiff was examined by Dr. Dobson and Plaintiff otherwise fails to present any evidence tending to support an argument that Dr. Dobson's decision following this examination did not comport with due process.

Process Committee are not identical to the Washington state requirements, they are sufficiently similar to the policies approved of in *Harper* and otherwise comport with the Due Process Clause.

The Georgia SOP provides that the three members of the Due Process Committee "will include a Deputy Warden of Care and Treatment or designee, a professional member of the mental health staff (counselor, mental health nurse[,] or psychologist)[,] and a medical staff member (RN, NP, PA[,] or physician)." SOP §§ VI(D)(2)(a-c). In weighing the "the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements," the Supreme Court in *Harper* determined that "an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by *medical professionals* rather than a judge." *Harper*, 494 U.S. at 231 (emphasis added). In the context of the involuntary administration of medication, procedural due process requires notice, opportunity to be heard, and an impartial decisionmaker with adequate medical expertise. The Due Process Committee members who served during Plaintiff's hearings were medical professionals who were not involved in Plaintiff's treatment. Spikes Aff. ¶ 5; Todd Aff. ¶ 5. The SOP encompasses these requirements.

Moreover, even assuming that procedural due process demands that a second reviewing *psychiatrist* play a role in the ultimate decision,[14] the SOP, facially and as

---

[14] "[T]he fact that the medication must first be prescribed by a psychiatrist, and then approved by a reviewing psychiatrist, ensures that the treatment in question will be ordered only if it is in the prisoner's medical interests, given the legitimate needs of his institutional confinement." *Harper*, 494 U.S. at 222.

applied, complies with this demand: pursuant to SOP § VI(C)(2)(c), after Plaintiff's treating psychiatrist determined that Plaintiff met the criteria to be placed on involuntary medication status, he was required to obtain, within 14 working days, a second opinion from another psychiatrist.  Dobson Aff. ¶¶ 9, 10, 11; Moyenda Aff. ¶¶  9, 12. Therefore, the requirements of due process were clearly met.  Defendants are entitled to judgment as a matter of law as to this claim.

> b.      Right to Appeal the Due Process Committee's Decision

Plaintiff also argues that Defendants violated his procedural due process rights by not providing for a right to appeal the Due Process Committee's decision to place Plaintiff on involuntary medication status.  Pl.'s Resp. in Opp'n MSJ 11-15 (citing Order 6, June 29, 2015, ECF No. 9 ("The Court in [*Harper*] found the availability of a method to appeal an involuntary medication decision significant to its determination that the prison's policy comported with due process.")).  Defendants contend that this argument is meritless for multiple reasons: (1) Plaintiff was provided an appeal because the decision to involuntarily medicate Plaintiff was made by his treating physicians, and then Plaintiff "automatically received the 'appeal' he sought" during his Due Process Committee Hearings, (Br. in Supp. of MSJ 15-16); (2) "Plaintiff could utilize the GDC grievance process as an additional layer of review of his involuntary medication decisions[,]" (*id.* at 16-17); and (3) even if the SOP did not sufficiently protect Plaintiff's procedural due process rights, the state has "cured" this deprivation by providing later procedural remedies in the form of O.C.G.A. §§ 50-13-19 (providing for judicial review of state agency determinations) and 37-3-163 (protecting of the rights of involuntarily medicated

patients), (*id.* at 16 n.7; Defs.' Reply 8-9, ECF No. 51).[15]  Each of Defendants' arguments is addressed below.

First, Defendants' contention that the Due Process Committee Hearing operates as an "appeal" is wholly without merit.  As an initial matter, such an interpretation of the Due Process Committee's function is inconsistent with the SOP's *explicitly* stated "Due Process Committee" definition and purpose.  *See* SOP § IV(A) (defining the Due Process Committee as a committee made up of three selected staff members "to act as *decision makers* in regard to involuntary medication administration at a due process hearing.") (emphasis added); *see also* SOP § IV(B) (defining a Due Process Hearing as a "meeting of assigned due process committee members *for the purpose of making an objective decision*, by independent and impartial people, whether to provide involuntary medication[.]") (emphasis added).  Moreover, even if the Court were to ignore the plain text of the SOP and adopt such an interpretation, any "decision" to involuntarily administer medication made by Plaintiff's treating psychiatrists would not comport with the other requirements of due process: namely, (1) that the decisionmaker be independent, impartial, and generally not involved with the inmate's diagnosis or

---

[15]  Defendants also argue that because the Supreme Court in *Harper* only determined that the Washington state scheme was constitutionally sound, but did not go so far as to hold that the Washington state procedures were required by due process, it is not clear that Plaintiff is entitled to an appeal.  Br. in Supp. of MSJ 16 ("The primary concerns of procedural due process as listed by the *Washington* Court: notice, an opportunity to be present and heard, to present evidence, and to question witnesses, as well as a possibility of judicial review, are all present in this case.") (internal footnote omitted). As discussed *infra*, the Court finds that Plaintiff has had, and the SOPs provide for, meaningful review of the decisions to forcible administer medication.  This argument is consequently not addressed.

treatment[16]; and (2) that a pre-deprivation hearing takes place before the final decision is reached.[17]

However, the Court does find Defendants' remaining two arguments meritorious. First, the GDC grievance process provides a potential additional layer of review of the decision to forcibly administer medication and is in all relevant respects similar to the "Superintendent appeal" process approved of by the Supreme Court in *Harper*.[18] Plaintiff has on five separate occasions filed grievances regarding the decisions to involuntarily administer medication, each of which were investigated and reviewed by the warden and were appealable to the GDC's Central Office.  In fact, Plaintiff states that it was because of the grievance process—specifically Grievance No. 153735—that he was permitted to transition to voluntary oral medication and eventually off medication entirely from late 2013 until August 2014.  Moyenda Aff. ¶ 10 & Attach. 4; Gamble Dep. 37-39.  The grievance process, therefore, provides further assurances that the decision to medicate Plaintiff was "neither arbitrary not erroneous," similar to the appeal process approved of in *Harper*.  494 U.S. at 228.

---

[16] "Adequate procedures exist here. In particular, independence of the decisionmaker is addressed to our satisfaction by these procedures. None of the hearing committee members may be involved in the inmate's current treatment or diagnosis."  *Harper*, 494 U.S. at 233.

[17] "Absent evidence of resulting bias, or evidence that the *actual decision is made before the hearing*, allowing respondent to contest the staff's position at the hearing satisfies the requirement that the opportunity to be heard must be granted at a meaningful time and in a meaningful manner.  *Harper*, 494 U.S. at 235 (internal citations and quotation marks omitted) (emphasis added).

[18] The Supreme Court in *Harper* listed the "right to appeal the committee's decision to the Superintendent of the Center" as one of the relevant aspects of the Washington state policy that served to provide inmates with adequate "procedural rights, before, during, and after the hearing."  *Harper*, 494 U.S. at 216

Second, even if this Court were to determine that the SOP fails to comport with the requirements of due process because of its failure to explicitly set out a method for internally appealing the decision to forcibly administer medication, which the undersigned declines to do, "the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *McKinney*, 20 F.3d at 1557 (referencing *Zinermon*, 494 U.S. at 123). Georgia law provides two statutory schemes allowing for judicial review of the administrative decision to involuntarily administer medication:  O.C.G.A. § 37-3-163(c) and O.C.G.A. § 50-13-19(a).   Code Section 37-3-163 establishes the "right of every individual to refuse medication;" provides for the procedures for when such refusals can be overridden; and preserves an individual's right to "request a protective order pursuant to Code Section 37-3-148"[19] should the patient continue to object to the forcible administration of medication.   O.C.G.A. §§ 37-3-163(b-c).   This provision not only provides Plaintiff with a statutory process designed to remedy the wrongful deprivation of the specific right to refuse medication, but also provides a process that has previously been found by courts to "'provide[ ] sufficient procedures to protect [a Plaintiff's] interest while accommodating legitimate state interests.'"  *Seymour v. Philbin*, No. 7:10-CV-38 HL, 2011 WL 4449674, at *4 (M.D. Ga. Sept. 7, 2011), *report and recommendation adopted,* No. 7:10-CV-38 HL, 2011 WL 4454167 (M.D. Ga. Sept. 26, 2011) (quoting

---

[19] "[A] person detained by a facility . . . may petition, as provided by law, for a writ of habeas corpus to question the cause and legality of detention and to request any court of competent jurisdiction on its own initiative to issue a writ for release."  O.C.G.A. § 37-3-148(a).

*Hightower*, 959 F. Supp. at 1567) (alterations in original).  Relatedly, O.C.G.A. § 50-13-19 states that "[a]ny person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter."[20]  O.C.G.A. § 50-13-19(a).  Through this more general statutory scheme, Georgia provided Plaintiff with the ability to obtain judicial review of each decision made by the Due Process Hearing Committee to overcome Plaintiff's right to refuse medication and to forcibly administer medication.

Plaintiff responds that the state of Georgia failed to "cure a procedural deprivation by providing a later procedural remedy," arguing that O.C.G.A. § 37-3-163 does not constitute an adequate remedy.  Specifically, Plaintiff argues that the statute only provides for the right to obtain a protective order, and therefore could not "fully compensate Plaintiff for the liberty loss [he] suffered."  (ECF No. 54 at 5.)  Such an argument is unpersuasive.  "Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process." *Parratt*, 451 U.S. at 544; *see also Hudson v. Palmer*, 468 U.S. 517, 535 (1984) ("In any event, that Palmer might not be able to recover under these remedies the full amount which he might receive in a § 1983 action is not, as we have said, determinative of the adequacy of the state remedies.").  The simple fact that the

---

[20] Georgia Code Section 50-13-2 defines a "contested case" as a "proceeding . . . in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing."  O.C.G.A. § 50-13-2(2).

statutory scheme does not entail the ability to obtain damages does not render the scheme constitutionally insufficient to protect against procedural due process violations.

Relatedly, the existence of a statute purporting to provide a later remedy does not foreclose any and all § 1983 claims that a violation of procedural due process occurred; a § 1983 claimant may still seek "a federal remedy 'where the state remedy, though adequate in theory, was not available in practice.'"  *Zinermon,* 494 U.S. at 124 (quoting *Monroe v. Pape,* 365 U.S. 167, 173-74 (1961)); *see also Hightower*, 959 F. Supp. at 1567 ("Deciding that Georgia's established procedures afford due process does not foreclose all possible procedural due process claims. If Plaintiff[] were to establish that Georgia does not follow its adopted procedure, Plaintiff[] could have created factual issues regarding whether [his] procedural due process rights were being violated.").  Plaintiff alternatively argues that he attempted to utilize this statutory scheme on two prior occasions, but that the "Superior Court of Tattnall County Georgia would not facilitate a habeas corpus as a remedy to protect the rights of patients subject to involuntary medications."  (ECF No. 52 at 3.)  Plaintiff fails to present any "evidence of a custom or policy that state actors ignore the procedural requirements," and that the remedy, therefore, is practically not available.  *Hightower*, 959 F. Supp. at 1567.  Moreover, even if Plaintiff were to establish that O.C.G.A. § 37-3-163 is "not available in practice," Plaintiff fails to address whether O.C.G.A. § 50-13-19 similarly fails in providing sufficient procedural due process protections.

In short, the SOP, facially and as applied, is constitutionally adequate because Plaintiff was provided with: notice of the "tentative diagnosis, the factual basis for the

diagnosis, and why the staff believes medication is necessary[;]" advance notice of the Due Process Hearing; the right to be physically present, present evidence, examine witnesses, and be represented by an advocate during the hearing; the ability to have the Due Process Committee's decision investigated and reviewed by the warden and thereafter the Central Office Mental Health Staff, should he utilize the grievance procedures; and the ability to seek judicial review by a state court "by means of a personal restraint petition or extraordinary writ." *See Harper*, 494 U.S. at 216. Plaintiff thus fails to state a procedural due process claim and it is recommended that Defendants' motion for summary judgment be granted.

C.    Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. "Qualified immunity protects government officials performing discretionary duties from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Anderson v. City of Naples*, 501 F. App'x 910, 915-16 (11th Cir. 2012) (internal quotation marks and citation omitted). "The purpose of qualified immunity is to allow officials to carry out discretionary duties without the chilling fear of personal liability or harrassive litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating federal law." *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009) (internal quotation marks and citation omitted).

"In order to receive qualified immunity, an official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful acts

occurred." *Id.*   Once the defendant shows that he or she was acting within her discretionary authority, the burden then shifts to the plaintiff to establish that qualified immunity does not apply. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2004). There is no question that Defendants were acting within their discretionary authority. *See, e.g., Holloman ex. rel Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (explaining that a government employee is acting within his discretionary authority when he "was (a) performing a legitimate job-related function . . . , (b) through means that were within his power to utilize[]").   Because that determination is made, the burden then shifts to Plaintiff to show that the Defendants are not entitled to qualified immunity.

"To overcome an official's claim of qualified immunity, the plaintiff must show that: (1) the official violated a constitutional right; and (2) that right was clearly established at the time of the alleged violation." *Anderson*, 501 F. App'x at 916 (citation omitted).[21]   The Court therefore must determine whether Plaintiff has sufficiently shown that Defendants' conduct violated Due Process and whether that right is clearly established.   As explained above, Plaintiff has failed to establish a Due Process violation and Defendants are consequently entitled to qualified immunity.   Even assuming, however, that Plaintiff has sufficiently shown a constitutional violation, such constitutional violation is not clearly established.

"To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v.*

---

[21] Courts should use their discretion in determining which prong of the qualified immunity inquiry to address first. *McCullough*, 559 F.3d at 1205.

*Howards*, -- U.S. --, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and citation omitted) (alteration in original).  "In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* (internal quotation marks and citation omitted).  The Eleventh Circuit has explained that

> [a] right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Maddox v. Stephens*, 727 F.3d 1109, 1121 (11th Cir. 2013).  Furthermore, "[t]he inquiry whether a federal right is clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (internal quotation marks and citation omitted).  "The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable [state official] that his conduct was unlawful in the situation he confronted."  *Id.* (quotation marks and citation omitted) (emphasis and alteration in original).  The court should look "only to binding precedent—cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose—to determine whether the right in question was clearly established at the time of the violation."  *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (citation omitted).

There is no law, case law or otherwise, that establishes that the decision to place an inmate on involuntary medication status when that inmate is extremely mentally ill;

has a past history of violent outbursts (including attacking a nurse with a knife); has caused no behavioral problems since being placed on involuntary medication status; and who has not been observed experiencing any serious side effects violates substantive due process rights.   Additionally, Plaintiff fails to point to any controlling authority that establishes that all Due Process Committees deciding whether to place an inmate on involuntary medication status must include a psychiatrist as a committee member. Similarly, Plaintiff has failed to point to any caselaw establishing that an inmate's due process rights are violated when the prison's involuntary medication procedures do not specifically lay out an internal administrative appeals process.   Moreover, even if Plaintiff were to point to such controlling precedent, there is no caselaw that holds that the GDC's grievance procedure cannot provide a necessary substitute for an internal appeals process or that the procedures laid out in O.C.G.A. § 50-13-19 and § 37-3-163 are, in practice, unavailable to claimants or otherwise insufficient to protect against unconstitutional deprivations.   To the contrary, the caselaw discussed *supra* indicates that courts have found these statutory procedures to adequately incorporate the requirements of due process.   *See Seymour*, No. 7:10-CV-38 HL, 2011 WL 4449674, at *4 (M.D. Ga. Sept. 7, 2011); *Hightower*, 959 F. Supp. at 1567.   It is thus not clearly established that Defendants' actions in this case violated any constitutional right, and they are entitled to qualified immunity.  Defendants' motion for summary judgment should be granted.[22]

---

[22] Defendants also argue that Plaintiff is not entitled to compensatory or punitive damages, because he did not suffer more than a *de minimis* physical injury.  Br. in Supp. of MSJ 19-20. Because it is recommended that the motion for summary judgment be granted, the Court declines to address this issue.

29

## II.     Plaintiff's Miscellaneous Motions

On February 2, 2016, Plaintiff filed a motion for "Court to Enquire of Defendants' Documentation" (ECF No. 49) asking about the "last sentence of Docket Text-Document Number 47," noting that he could not read a portion of the docket sheet, and stating that the envelop that contained the Motion for Summary Judgment was ripped.   As it is unclear what relief Plaintiff is seeking with this motion and as it appears Plaintiff's ability to respond to the substance of Defendants' motion for summary judgment was otherwise unimpeded, this motion is terminated as moot.

Plaintiff also moves to "Deny or at Least Stay Defendants' Reply," claiming that the Reply was untimely filed because Plaintiff was only given until March 2, 2016 to respond to Defendants' motion for summary judgment, but Defendants' Reply was filed on March 17, 2016, leaving Plaintiff with no recourse to address the arguments presented by Defendants therein.  (ECF No. 52 at 1-2.)   Plaintiff therefore requests that the Court either strike this Reply or, in the alternative, provide Plaintiff with additional time to obtain additional discovery and to then file a surreply.  *Id.* at 2-3.   To the extent this motion may be construed as a motion for leave to file a surreply brief in accordance with Local Rule 7.3.1(c), and this motion is granted. The Court construes the "Suppl[emental] Motion to Refute Defendants' Bruce Chatman and Stanley Williams' Reply Brief" (ECF No. 54) as Plaintiff's surreply brief and terminates this motion.

Plaintiff also moves for appointment of counsel.  (ECF No. 61.)  Pursuant to 28 U.S.C. § 1915(e)(1), "[a] district court has discretionary authority . . . to appoint counsel for an indigent defendant in civil cases."  *Holt v. Ford*, 862 F.2d 850, 853 (11th Cir.

1989).  When deciding to appoint counsel, the court must consider the legal and factual complexity of the plaintiff's case.  *Id.*  Generally, no right to counsel exists in § 1983 actions; appointment of counsel is a privilege justified only by "exceptional circumstances."  *Wahl v. McIver*, 773 F.2d 1169, 1174 (11th Cir. 1985).  No exceptional circumstances justifying appointment of counsel are found in this action.  Accordingly, Plaintiff's motion to appoint counsel (ECF No. 61) is denied.

On May 1, 2016, Plaintiff filed a motion for leave to supplement his complaint adding Eighth Amendment claims against various GSP officials for the use of excessive force and seeking a preliminary injunction "prohibiting said Defendant[s], his successors in office, agents, and employees and all other persons acting in concert and participation with them from using chemical warfare[.]"  (ECF No. 56.)  Therein, Plaintiff states that he intends to file a supplement complaint at a later date that will lay out, in more detail, a series of events where Plaintiff was sprayed with "chemical weapons," even though he did not pose any threat, and thereafter was not provided sufficient time to clean off the chemical agents, and suffered "choking, blindness, and burning[.]"  Mot. to Suppl. Compl. & for Prelim, Inj. ¶¶ 1, 3-15.  Defendants oppose the motion for leave to file a supplemental complaint, contending that such claims are not sufficiently related to the underlying action.  (ECF No. 58.)  This Court agrees, and recommends denying Plaintiff's motion for leave to file a supplemental complaint and therefore recommends denying Plaintiff's motion for preliminary injunctive relief based on any such claims.

Federal Rules of Civil Procedure Rule 15(d) provides that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental

pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Since Plaintiff has already been granted leave to amend (*see* Order 3-4, Dec. 4, 2015, ECF No. 32), he must now seek leave to amend/supplement pursuant to Federal Rules of Civil Procedure Rule 15(a)(2), and such leave should be "freely give[n]" when "justice so requires."[23] However, "a district court may properly deny leave to amend the complaint under Rule 15(a) when such amendment would be futile." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1262-63 (11th Cir. 2004).

Plaintiff may not join unrelated claims and various defendants in his Supplemental Complaint unless the claims arise "out of the same transaction, occurrence, or series of transactions or occurrences *and* if any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20 (emphasis added). "[A] claim arises out of the same transaction or occurrence if there is a logical relationship between the claims." *Construction Aggregates, Ltd. v. Forest Commodities Corp.*, 147 F.3d 1334, 1337 n.6 (11th Cir. 1998). Thus, "Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2." G*eorge v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007). In other words, a plaintiff may set forth only related claims in a single lawsuit.

Plaintiff's allegations fail to show any "logical relationship" between the excessive force claims against various GSP officials and those relating to his alleged due

---

[23] "[T]he formal distinction between amendment and supplementation is of no consequence, and courts routinely apply Rule 15(a)'s 'freely given' standard to Rule 15(d) motions to supplement." *McGrotha v. Fed Ex Ground Package Sys.*, No. 5:05-cv-391 CAR 2007 WL 640457, at *2 (M.D. Ga. Feb. 24, 2007) (internal quotation marks and citation omitted).

process violations discussed above. Whether the decision by Defendants to involuntarily administer medication to Plaintiff is constitutional does not contain any common questions of law or fact with an alleged excessive use of chemical agents by various (non-party) officials at GSP. For this reason, it is recommended that Plaintiff's motion to supplement be denied.

Plaintiff also seeks an injunction against Defendants and vaious non-party officals at GSP to prevent future "chemical warfare." Injunctive relief is only appropriate where the movant demonstrates that: (a) there is a substantial likelihood of success on the merits; (b) the preliminary injunction is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that a preliminary injunction would cause to the non-movant; and (d) the preliminary injunction would not be adverse to the public interest. *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001). An irreparable injury "must be neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).

Plaintiff has failed to establish a "substantial likelihood of success on the merits." As it is recommended that Plaintiff's motion to supplement be denied, Plaintiff cannot establish that his excessive force claims for the use of "chemical warfare" are substantially likely to succeed on the merits. Accordingly, it is recommended that Plaintiff's motion for preliminary injunctive relief also be denied.

## CONCLUSION

For the reasons explained above, Plaintiff's motion for "Court to Enquire of Defendants' Documentation" (ECF No. 49) is terminated, Plaintiff's motion to "Deny or

at Least Stay Defendants' Reply Brief" (ECF No. 52) is granted to the extent Plaintiff seeks leave to file a surreply brief, Plaintiff's "Suppl[emental] Motion to Refute Defendants' Bruce Chatman and Stanley Williams' Reply Brief" (ECF No. 54) is terminated, and Plaintiff's motion to appoint counsel (ECF No. 61) is denied.  It is recommended that Defendants' motion for summary judgment (ECF No. 47) be granted and that Plaintiff's Motion to Supplement Complaint and for Preliminary Injunctive Relief (ECF No. 56) be denied.  Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, within fourteen (14) days after being served with a copy hereof.  The district judge shall make a de novo determination of those portions of the Recommendation to which objection is made.  All other portions of the Recommendation may be reviewed for clear error.

The parties are hereby notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

SO ORDERED and RECOMMENDED, this 30th day of June, 2016.

/s/ Stephen Hyles
UNITED STATES MAGISTRATE JUDGE